AO 91
Rev. 11/82

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA v. BENGA AKANNI OYENIRAN | DOCKET NO. <br><br> MAGISTRATE'S CASE NO. <br> 12-1862M |

Complaint for violation of Title 18, United States Code §§ 1349, 1344 (Conspiracy to Commit Bank Fraud)

| NAME OF MAGISTRATE JUDGE | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, CA |
|---|---|---|
| Hon. Patrick J. Walsh | | |
| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
| continuing through July 11, 2012 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning in or before 2011, and continuing through at least July 11, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendant BENGA AKANNI OYENIRAN, and others known and unknown to the United States Attorney, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344. The object of the conspiracy was to be carried out, in substance, as follows: defendant OYENIRAN would obtain victims' identifying information from stolen mail and online searches and would apply for new or replacement credit cards in the names of the victims but using addresses he controlled. Defendant OYENIRAN and his co-conspirators would then use the fraudulently obtained credit cards to make ATM withdrawals and purchases, including at collusive merchants who would split the proceeds. Federally-insured financial institutions which were defrauded as a result of this conspiracy include Fifth Third Bank and Capital One.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | /S/ | SIGNATURE OF COMPLAINANT <br> Sean Klenin <br><br> OFFICIAL TITLE <br> United States Postal Inspector |
|---|---|---|
| Sworn to before me and subscribed in my presence, <br> SIGNATURE OF MAGISTRATE JUDGE(1) <br> PATRICK J. WALSH | | DATE <br> August 2, 2012 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.
AUSA Andrew Brown (11th floor, x0102)      WARRANT

# AFFIDAVIT

I, Sean Klenin, being duly sworn, hereby depose and say:

## I. INTRODUCTION

1. I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"), Los Angeles Division, Los Angeles, California. I have been so employed with USPIS since April 2005. I completed a twelve-week basic training course in Potomac, Maryland that included training in internet crimes, mail fraud, and financial crime investigations. I attend meetings coordinated by the International Association of Financial Crimes Investigators. In part, these meetings discuss a number of topics, including identity fraud investigations. In August 2006, I attended a four-day white collar crime training seminar in Columbia, South Carolina sponsored by the Executive Office for United States Attorneys, Office of Legal Education. I am a member of the Los Angeles Identity Theft/Economic Crimes Task Force ("ITEC"). As a U.S. Postal Inspector, my duties are to investigate violations of postal law, including credit card fraud, mail theft, mail fraud, and related financial crimes. In preparing this affidavit, I have consulted with other law enforcement officers and agents with many years of combined experience in the field of financial crime investigations

1

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a complaint and arrest warrant for Benga Akanni Oyeniran ("OYENIRAN") for violations of Title 18, United States Code, Sections 1349 and 1344 (Conspiracy to Commit Bank Fraud).

3. While the information set forth below is provided as a broad overview of the investigation conducted to date, it does not purport to list all facts known to the agents or others involved in this investigation.

## III. PROBABLE CAUSE

### A. Background Regarding Fraudulent Applications and Account Takeover Schemes

4. The present investigation involves a scheme to fraudulently open credit card accounts using victims' personal identifying information and also committing fraudulent account takeovers of victims' already existing accounts (the "CREDIT CARD SCHEMES").

5. Based upon my training and experience, I know that CREDIT CARD SCHEMES often employ a variety of means to carry out these schemes, and frequently operate as follows:

    a. In the fraudulent application portion of the scheme, the schemers, without the knowledge or authorization of the victims, fraudulently use victims' personal identifying information to apply for credit cards accounts;

2

b. In the account takeover portion of the scheme, the schemers, without the knowledge or authorization of the victims, fraudulently takeover the victims' existing valid credit card accounts. These accounts can be taken over in a variety of ways, including, but not limited to the following:

i. Convincing financial institutions that the schemers are the true cardholders of valid credit card accounts and having replacement credit cards belonging to the victims sent to alternate addresses controlled by the schemers; and

ii. Convincing financial institutions that the schemers are the true cardholders of valid credit card accounts and causing financial institutions, through requests from the schemers, to conduct balance transfers from the victims' valid credit card accounts to fraudulent credit card accounts at various other financial institutions and belonging to the same and/or other victims; and

c. The schemers can obtain liquid funds by making false purchases using the fraudulently obtained credit cards belonging to victims. Some schemers own or control credit card merchant accounts, or are in league with businesses that have such accounts. The schemers use the fraudulently obtained credit cards to charge alleged "purchases" using the merchant's credit card terminal even though no goods or services may have been provided as a result of such transactions. The financial institutions and their agents pay the funds transacted on such

alleged purchases to the merchant by depositing funds to the merchants' checking accounts, from which they can be accessed and shared by the schemers.

B. Fraud Referral from Fifth Third Bank

6. In or about June 2012, ITEC was contacted by Chris Allen, a fraud investigator from Fifth Third Bank ("FTB"), which I know from my training and experience is a federally-insured financial institution, as are all the banks mentioned in this affidavit. Investigator Allen explained that FTB was experiencing a series of fraudulent credit card account takeovers in which schemers fraudulently requested replacement credit cards belonging to some of their true customers' credit card accounts. These credit cards were subsequently mailed to addresses controlled by the schemers and then fraudulently charged at merchant locations, and/or used to conduct fraudulent cash advances at Los Angeles area ATM machines, and/or fraudulently charged at various collusive credit card merchant accounts believed to be non-existent shell companies. The aforementioned fraudulent activities caused FTB to incur an initial loss believed to be in excess of approximately $50,000.

7. Subsequent to the FTB investigation into the aforementioned scheme, it was further discovered by FTB investigators that an additional set of FTB victim accounts experienced a balance transfer scheme. In this scheme, one or more unknown schemers telephoned FTB, purported to be the true

cardholders, and then requested fraudulent balance transfers between various FTB credit card accounts and credit card accounts belonging to other financial institutions, including, but not limited to, American Express and Capital One. By doing so, the schemers caused a charge to be placed on the FTB victims' credit card accounts and a credit to be placed on the credit card accounts belonging to the other financial institutions. This technique allows schemers to free up or artificially increase the credit line of the credit card accounts receiving the credit and thus, allowing the schemers greater freedom to charge up these victim credit card accounts with additional fraudulent charges. At this time, FTB has reported to have incurred an initial loss believed to be in excess of approximately $100,000. It is believed the aforementioned initial fraud referral from FTB, with the loss of approximately $50,000, links, at least in part, to this secondary scheme, for example, by one or more common street addresses on one or more of the credit card accounts that received the balance transfer credits from FTB.

  C. <u>ITEC'S Investigation</u>

  8. FTB has provided ITEC with banking documentation related to the aforementioned schemes. I subsequently reviewed these documents and based upon my review of these documents, as well as from discussions I have had with FTB fraud investigators, I learned the following, among other information:

    a. There were fraudulent merchant transactions, such

as gasoline and restaurant purchases;

  b. There were fraudulent purchases conducted at what appear to be shell merchants. I know from my training and experience that a schemer involved in the described scheme will often work with co-schemers that are in control of various credit card merchant accounts, i.e., shell merchants. In working with these other co-schemers, the fraudulently obtained credit cards can be charged at the merchant terminals, which are controlled by the co-schemers. In conducting such transactions, where no sale of merchandise actually occurs, money is subsequently transferred into the checking accounts of the co-schemers and can then be shared and distributed to involved co-schemers;

  c. There were fraudulent cash advances conducted at ATM's by at least one of the conspirators; and

  d. There were fraudulent balance transfers from FTB credit card accounts to other credit card accounts belonging to other financial institutions.

  9. In looking at documentation provided by FTB regarding the balance transfer scheme, it was determined that on or about May 2, 2012, a fraudulent balance transfer, in the amount of approximately $12,000, was initiated between FTB credit card account number XXXX-XXXX-XXXX-7304, in the name of victim J.Z., and American Express account number XXXX-XXXXXX-X2001. Team Leader Inspector Eric Shen subsequently contacted Natalie Morgan, a fraud investigator at American Express, and provided her with

the aforementioned American Express account number. Investigator Morgan subsequently provided Team Leader Inspector Shen with information concerning this account, which I reviewed. Based upon my review and with speaking to Investigator Morgan, I learned, among other things, the following:

    a. The account is in the name of victim S.H. and is a fraudulent application account opened on or about April 3, 2012;

    b. The account experienced a variety of fraudulent charges;

    c. The account mailing address was 3801 East Pacific Coast Highway, Apartment 211, Long Beach, California 90804;

    d. On or about April 26, 2012, a person reported that the credit card was not received and another card was sent to a mailing address of 3025 West Artesia Boulevard, Apartment A52, Torrance, California 90504 (the "TORRANCE ADDRESS);

    e. On or about May 8, 2012, the address was changed on the account to the aforementioned TORRANCE ADDRESS;

    f. On or about May 22, 2012, S.H. reported this account as fraudulent;

    g. The loss incurred by American Express on this account is approximately $2,170.85; and

    h. American Express has conducted a preliminary assessment of various other credit card accounts that are linked by such commonalities such as address, IP address, and/or other information and has determined that they have incurred a loss of

7

approximately $48,585.29 at this time.

    D.   <u>ITEC'S Investigation Linked to Hawthorne Police Department's Investigation</u>

10. On or about July 13, 2012, Jason Reynolds, a fraud investigator with American Express, informed me that he believed our investigation was connected to an investigation being conducted by Detective Bradley Jackson with the Hawthorne Police Department. Subsequent to this, in or about July 2012, Inspector Scott Robbins and I met with Detective Jackson at the Hawthorne Police Department. Based upon our meeting, as well as documentation and investigative reports provided by Detective Jackson at around the same time period, I learned, among other information, the following:

    a.   In or about June 2012, Detective Jackson began investigating an identity theft report which was forwarded to him from the Ventura County Sheriff's Department. In the report, the victim, A.A., reported that an American Express credit card account had been fraudulently opened without his consent. A.A. indicated that the balance on the account was $11,384.38 and that $8,803.35 worth of transactions were completed in the city of Hawthorne;

    b.   The aforementioned American Express account number is XXXX-XXXXXX-X1002;

    c.   The aforementioned American Express account was applied for online on or about February 11, 2012 and during the

application process, American Express captured internet protocol address 69.231.198.136 (the "IP ADDRESS");

    d.    Through his investigation, Detective Jackson determined that the IP ADDRESS belonged to the internet service provider AT&T Internet Services with a subscriber name of OYENIRAN with a service address of 1669 West Begonia Way, Gardena, California 90248 (the "GARDENA PREMISES");

    e.    On or about February 17, 2012, the address of the aforementioned American Express account was changed to the TORRANCE ADDRESS (this is the same address linked to the balance transfer scheme associated with FTB and American Express, as previously discussed), which Detective Jackson determined to be a mailbox rental location;

    f.    Detective Jackson learned that OYENIRAN had an extensive criminal history;

    g.    On or about July 11, 2012, Detectives from the Hawthorne Police Department served a State of California search warrant at the GARDENA PREMISES. After conducting a knock and notice and waiting approximately a minute with no response at the front door, the ram was used to make forced entry into the GARDENA PREMISES. OYENIRAN was then observed walking down the stairs toward the detectives, subsequently ignored their commands, and turned around going back toward his bedroom. After a few moments, OYENIRAN finally complied with detectives' commands and was taken into custody. Detective Jackson

ultimately examined the East bedroom, which was under the dominion and control of OYENIRAN. Detective Jackson indicated the room only contained men's clothing, which was inside a closet containing court and immigration documents in the name of OYENIRAN. Detective Jackson indicated he located numerous items relating to identity theft next to mail in the name of OYENIRAN;

    h. While at the GARDENA PREMISES, Detective Jackson spoke with Debra Oyeniran, who advised him that OYENIRAN had sole control of the East bedroom and it was the bedroom where he kept all of his property; and

    i. OYENIRAN was arrested at the GARDENA PREMISES, however, he is currently out of custody and no formal case has been filed with the Los Angeles County District Attorney's Office. As such, Detective Jackson has agreed to work with ITEC and have OYENIRAN prosecuted federally.

11. Based upon my review of some of the items seized from the GARDENA PREMISES, documentation provided by Detective Jackson, as well as conversations I have had with Detective Jackson, I have learned, including but not limited to, the following:

    a. Items seized from the OYENIRAN's East bedroom include, but are not limited to:

        i. Computers;

        ii. Cellular telephones;

        iii. Approximately (30) cellular SIM cards,

    including one SIM card believed to be for telephone number (310) 634-6711 (these are used to change telephone numbers within cellular telephones);

  iv. Credit cards in other people's names (including M.M. and D.T.), receipts, checkbooks, and credit card mailer applications from Capital One in the names of M.M. and D.T.;

  v. Mail in the name of OYENIRAN, his Gucci wallet contained within a fanny pack, as well as numerous keys (which appear to belong to various mailbox rental locations);

  vi. A fraudulent identification with another person's photograph on it; and

  vii. Cash and U.S. Postal Service money orders; and

b. Items seized from other locations within the GARDENA PREMISES and/or vehicles including, but not limited to, the following:

  i. Cellular telephones;

  ii. Computers;

  iii. Cash;

  iv. Miscellaneous documents; and

  v. Paperwork in other's names.

12. During the course of this investigation, Detective Jackson provided me with a preliminary assessment of forensic analysis conducted on a computer found in OYENIRAN's bedroom at the GARDENA PREMISES. Based upon conversations I have had with Detective Jackson, as well as Detective Jackson providing me with some of the documents retrieved from the computer to date, I learned that the following were found on the computer:

a. Numerous documents (the "documents") containing personal identifying information such as the names, ages, birthdates, social security numbers, addresses, and telephone numbers of approximately (51) persons.

13. I further reviewed the documents retrieved from the computer recovered from OYENIRAN's bedroom and subsequently determined, among other information, the following:

a. A three page typed document containing the name of J.Z., date of birth, social security number, address history, phone numbers, and other personal information. This is the same victim that experienced a fraudulent account takeover with his FTB credit card account number XXXX-XXXX-XXXX-7304 in which there was an approximately $12,000 fraudulent balance transfer to another victim's American Express account number XXXX-XXXXXX-X2001 (victim S.H.);

b. A two page typed document containing the name of S.H., date of birth, social security number, address history, phone numbers, and other personal information. This is the same

victim as referenced in the above paragraph related to Express account number XXXX-XXXXXX-X2001. Furthermore, I reviewed American Express documentation concerning this account and learned that telephone number (310) 634-6711 was captured by American Express as calling into this account on several occasions. As previously indicated, a SIM card believed to be connected to telephone number (310) 634-6711 was recovered from the GARDENA PREMISES within OYENIRAN's bedroom; and

    c. A three page typed document containing the name of A.A., date of birth, social security number, address history, phone numbers, and other personal information. This is the original victim which initiated Detective Jackson's investigation.

    E. <u>Criminal History</u>

    14. During the course of my investigation, I reviewed personal and criminal history information concerning OYENIRAN and learned, including but not limited to, the following information:

    a. He has an extensive criminal history dating back to in or about 1990;

    b. In or about 1990, he was convicted of a felony in Orange County Superior court for access device related fraud and sentenced to (36) months probation, (90) days jail, and a fine. It appears the imposition of the sentence was possibly suspended. According to Orange County Superior Court records, he was arraigned several times for probation violation allegations;

13

   c. In or about 1991, he was convicted of felonies in Orange County Superior court for burglary, grand theft, access device related fraud, and impersonating to make another liable, and sentenced to (36) months probation, (365) days jail, and a fine. It appears the imposition of the sentence was possibly suspended;

   d. In or about 2001, he was convicted of felonies in the U.S. District Court, Central District of California, for making a false statement in an application for a passport and embezzlement of public money. He was sentenced by the Honorable U.S. District Judge Alicemarie H. Stotler to (24) months in federal prison, (5) years of supervised release, and a fine;

   e. In or about 2004, a bench warrant was issued for OYENIRAN by the Honorable U.S. District Judge Alicemarie H. Stotler after the U.S. Probation Department requested a bench warrant be issued for allegations of violating his terms and conditions of supervised release based upon information provided to the U.S. Probation Department by the USPIS. He was subsequently sentenced by the Honorable U.S. District Judge Alicemarie H. Stotler to an additional (15) months in federal prison and (21) months supervised release. The allegations included, but are not limited to:

     i. Failing to report to the United States Probation Office after being ordered by the court to do so within (72) hours after

14

>  > reentering the United States; and
>
> ii. Possession of an Ohio driver's license in the name of T.O.A, a Sears mastercard in the name of P.R.G., a Sears mastercard in the name of L.S.B., a Bank of America visa card in the name of D.L.B., and a computer printout containing the names, social security numbers, dates of birth, telephone numbers, and addresses of four individuals (this previous conduct is very similar to the instant case ITEC has been investigating). This was after being ordered by the court to not obtain or possess any driver's license, social security number, birth certificate, passport, or any other form of identification in any name, other than his true legal name.
>
> f. In or about 2007, he was convicted of a felony in Los Angeles Superior court for burglary and sentenced to (3) years state prison; and
>
> g. He has numerous aliases.

15. I reviewed a letter, dated January 8, 2004, in which a U.S. Probation Officer addressed the Honorable U.S. District Judge Alicemarie H. Stotler in order to report violations of supervised release by OYENIRAN. In part, the letter indicated that the U.S. Probation Officer learned that, according to

records from the Bureau of Prisons, OYENIRAN was released from the Eden Detention Center on December 13, 2002 to the custody of the INS. The letter also indicated that INS, now known as "BICE," verified OYENIRAN was deported to Nigeria on February 12, 2003. ICE Special Agent Aron Klaff further informed me that OYENIRAN had been deported from the United States twice.

IV. **CONCLUSION**

15. Based upon the above, I believe that there is a probable cause to believe that OYENIRAN has committed violations of Title 18, United States Code, Sections 1349 and 1344 (Conspiracy to Commit Bank Fraud).

/S/
_____
Sean Klenin
United States Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to before me this 2nd day of August, 2012.

PATRICK J. WALSH

_____
United States Magistrate Judge

16